# EXHIBIT A

FILED DISTRICT COURT
Third Judicial District

SEP 24 2010

SALT LAKE COUNTY

By_____

Deputy Clerk

RANDALL K. SPENCER (6992)
MATTHEW R. HOWELL (6571)
FILLMORE SPENCER LLC
3301 North University Avenue
Provo, Utah  84604
Telephone:     (801) 426-8200
Facsimile:      (801) 426-8208
Email:           rspencer@slaw.com
                 mhowell@fslaw.com

JONATHAN K. TYCKO
MELANIE WILLIAMSON
TYCKO & ZAVAREEI LLP
2000 L Street, N.W., Suite 808
Washington, D.C. 20036
Telephone:     (202) 973-0900
Facsimile:      (202) 973-0950
Email:           jtycko@tzlegal.com
                 mwilliamson@tzlegal.com

Attorneys for Plaintiffs Chelsi Miller,
       Daniel Marty, and Christie Cotton

360

---

## IN THE THIRD JUDICIAL DISTRICT COURT, SALT LAKE CITY COUTY

### STATE OF UTAH

| | |
|---|---|
| CHELSI MILLER, DANIEL MARTY, and CHRISTIE COTTON on behalf of themselves and all persons similarly situated,<br><br>                    Plaintiffs,<br><br>    vs.<br><br> CORINTHIAN COLLEGES, INC., and DOES 1 through 20, inclusive,<br><br>                    Defendants. | COMPLAINT FOR:<br>(1) VIOLATIONS OF THE UTAH CONSUMER SALES PRACTICES ACT;<br>(2) FRAUDULENT MISREPRESENTATION;<br>(3) NEGLIGENT MISREPRESENTATION; and<br>(4) DECLARATORY RELIEF.<br><br>JURY TRIAL DEMAND<br><br>Case No. 100918220<br><br>Judge Fratto |

Plaintiffs, by and through the undersigned attorneys, for their Complaint, allege as follows.

## PRELIMINARY ALLEGATIONS

1.      This is a proposed class action lawsuit filed by students of the Everest College, Salt Lake City campus ("Everest"). Everest is owned and operated by defendant Corinthian Colleges, Inc. ("Corinthian" or "Defendant"), a publicly traded, for-profit company. Plaintiffs seek relief in this action individually, and as a class, on behalf of similarly situated residents in the State of Utah.

2.      This lawsuit alleges that Defendant has engaged in two primary forms of wrongdoing. First, Defendant makes misrepresentations to potential students about whether credits or degrees earned at Everest can be transferred to other post-secondary universities and community colleges, and, even though it informs potential students that it is "accredited," fails to disclose that the type of "accreditation" Everest has is not generally recognized by other post-secondary institutions. Second, Defendant makes misrepresentations and omissions about the cost of its programs at Everest. Both of these two forms of misrepresentations or omissions are discussed in detail in this Complaint.

3.      Everest advertises itself as a "career training" and "life skills" college. Students may enroll in one to three year certificate or associate's degree programs in sixteen broad "career" categories such as business, medical administrative assisting, medical insurance billing and coding, pharmacy technology, and surgical technology. The school also has a very limited

bachelor degree program with respect to three of the sixteen "careers." Corinthian has publicly

noted that the Everest brand's appeal is to "low-income and minority students" who consider

Everest "the door to future career training for many people who need it urgently."[1]   For many

Everest students, the career college is the student's first entrée into the world of post-secondary

education, and the students plan to transfer credits earned at Everest to other institutions of

higher education where they can further or complete their education.

4.      Plaintiffs, and other members of the class, enrolled in Everest to earn credits and

receive degrees that they believed would be recognized at other post-secondary institutions.

Everest devised and implemented a misleading recruiting process in order to foster this belief.

Most significantly, Everest represents to potential students that it is "accredited," and that credits

earned at Everest can be transferred to other post-secondary schools.  But Everest fails to

disclose that the type of "accreditation" that it has is not actually recognized by most public and

non-profit schools, including the majority of universities and community colleges in Utah.

Students who enroll at Everest – and typically incur tens-of-thousands of dollars in debts to pay

the Everest tuition – learn only after-the-fact that the credits they have earned at Everest cannot

be transferred to the other schools where they hope to complete their education.  Thus, these

students do not get what Everest had promised them, and what they had paid for.

5.      Everest also deliberately prevents prospective students from ascertaining the true

cost of its tuition and fees, and may in fact charge varying amounts of tuition and fees amongst

---

[1] "Corinthian Colleges, Inc. Reminds Washington: 'Our Graduates' Careers Count!" (September 20, 2010) (available at 'http://newsroom.cci.edu/phoenix.zhtml?c=115380&p=irol-newsArticle&id=1472738).

its students based on the amount of financial aid for which each student qualifies.   Everest never advertises or makes public its actual tuition or fees to prospective students.  Rather, during an in-person enrollment process, prospective students are given an "estimate" in writing.  But Everest then has the students fill out paperwork that allows Everest to seek student loans on the students' behalf that are far in excess of that "estimate."  Although those loans are ostensibly applied for on behalf of the students, the funds from the loans are disbursed directly to Everest, and students typically only discover the full amount of their debt after-the-fact.  And that debt is typically far in excess of the original "estimates" they were given at time of enrollment.

6.       This pattern of conduct was the subject of hearings conducted by the United States Senate Committee on Health, Labor & Pensions ("HELP Committee") which began on June 4, 2010, in an effort to address various alleged patterns of misconduct by for-profit colleges such as Corinthian.  An August 4, 2010 report discussed at the hearings revealed that, in an undercover investigation of 15 for-profit colleges, *all 15 schools* engaged in "fraud, deceptive practices or made misleading statements" to prospective students.[2]  At the hearing, the Managing Director of the GAO's Office of Forensic Audits and Special Investigations testified that the for-profit college industry is like "the wild west" where it "was difficult to sift through fact from fiction."[3]  The GAO's findings of misconduct are extensive, and very similar to the conduct of

---

[2] Statements of Sen. Tom Harkin at *For Profit Schools:  The Student Recruitment Experience before the S. Comm. on Health Education Labor & Pensions*, 11th Cong. ___ (2010) (hereinafter "Second HELP Committee Hearing") (video and audio accessible at: http://help.senate.gov/hearings/hearing/?id+19454102-5056-9502-5d44-e2aa8233ba5a); see also Testimony of Gregory Kutz before the HELP Committee, *For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices* (Aug. 4, 2010) (hereinafter "Undercover Report').
[3] Statements of Gregory Kutz Second HELP Committee Hearing.

Everest that is described in this Complaint.  The allegations include, but are not limited to, deceptive and questionable statements regarding the schools' accreditation, graduation rates, prospective employment and salary qualifications, duration and cost of the program, and financial aid.[4]  The report also noted that representatives at schools "employ[ ] hard-sell sales and marketing techniques" to encourage students to enroll.[5]

7.     Every instance of fraud documented in the GAO report took place during face-to-face or telephonic meetings with admissions or financial aid representatives.  Thus, the report confirmed that a significant portion of the fraud is perpetrated directly by school representatives during the recruiting process.

8.     On the day before the HELP Committee hearing, Harris Miller, President and CEO of the Career Colleges Association (of which Corinthian is a member) wrote a letter to member schools and urged the schools that the "GAO report has to be a wakeup call to everyone in the sector that compliance in the critical areas of admissions and financial aid" is "not what it needs to be," and observed that "for an investigation to show so many problems in every school contacted is not good news."[6]  He indicated that both he and the schools should not "try to defend the indefensible, such as the findings of the GAO report," and urged the schools to "wake-up."[7]  Notably, Miller emphasized, perhaps too late, that to overcome these egregious

---

[4] Undercover Report, p. 7-12.
[5] Undercover Report, p. 12.
[6] Letter dated Aug. 3, 2010, from Harris Miller to CCA members.
[7] *Id.*

practices, "leadership on compliance must come from the top" and that "[a] culture of compliance must permeate the organization."[8]

9.      Another Senate report found that, despite enrolling only 10% of post-secondary education students, for-profit colleges obtain 25% of the $89 billion Federal Title IV loans distributed annually to post-secondary institutions nationwide.[9]   It also found that for-profit colleges spend a disproportionate amount on television advertisements, billboards, phone solicitations, web marketing, and hiring aggressive sales staff.[10]   It pays off:  for-profit colleges enjoy profits that are among the highest in corporate America.

10.      According to its March 2010 10-K report, Defendant Corinthian is one of the largest for-profit, post-secondary education companies in North America.  The company has generated substantial revenues and profits from the fraudulent practices employed at Everest, at the expense of Plaintiffs and the members of the class.

11.      Defendant's fraudulent recruiting practices are deceptive and unconscionable acts under the Utah Consumer Sales Practices Act ("UCSPA"), Utah Code Ann. §§ 13-11-4 and -5. The fraudulent recruiting practices also constitute fraudulent and negligent misrepresentation under Utah law.

12.      By way of this lawsuit, Plaintiffs seek to: (a) permanently enjoin Defendant from engaging in the fraudulent, deceptive, and misleading practices described herein; (b) obtain

---

[8] *Id.*
[9] HELP Committee, *Emerging Risk? An Overview of Growth, Spending, Student Debt and Unanswered Questions in For-Profit Higher Education* at 3-4 (June 24, 2010).
[10] *Id.*

treble damages, statutory penalties, and punitive damages under the UCSPA for Defendant's fraudulent, deceptive, and misleading practices; (c) obtain a measure of common law compensatory damages for Defendant's fraudulent and negligent misrepresentation; (d) impose constructive trusts on all monies by which Defendant was unjustly enriched through enrolling students in programs by fraudulent, deceptive, and misleading practices; and (e) all such other and further relief to which they may be entitled under the UCSPA and common law.

## JURISDICTION

13.     This Court has subject matter jurisdiction over this class action pursuant to Utah Code Ann. § 78A-5-102(1).  The circumstances giving rise to this action occurred in whole or in part in Salt Lake City, Utah, in the county in which this Court sits.

14.     This Court has personal jurisdiction over the parties because Plaintiffs are residents of Salt Lake County and the State of Utah, and/or attended school in Salt Lake County and the State of Utah.  Defendant has systematically and continually conducted business in Salt Lake County and throughout the State of Utah.

## VENUE

15.     Venue is proper in this Court pursuant to Utah Code Ann. § 78B-3-307 because Defendant conducts business in Salt Lake County, in the State of Utah and the cause of action arose in Salt Lake County.  Plaintiffs are informed and believe that Defendant receives substantial revenue from the enrollment within this County.

## THE PARTIES

16.     Plaintiff Chelsi Miller is a resident of Midvale, Utah.  Ms. Miller met with an Everest representative and enrolled at Everest in 2006.  Ms. Miller has paid or incurred debt of over $30,000 for Everest tuition and fees.

17.     Plaintiff Daniel Marty is a resident of West Valley, Utah.  Mr. Marty met with an Everest representative and enrolled at Everest in 2008.  Mr. Miller has paid or incurred debt of over $40,000 for Everest tuition and fees.

18.     Plaintiff Christie Cotton is a resident of Salt Lake City, Utah in Salt Lake County, Utah. Ms. Cotton met with an Everest representative and enrolled at Everest in 2005.  Ms. Cotton has paid or incurred debt of over $30,000 for Everest tuition and fees.

19.     Corinthian owns and operates Everest.  Corinthian is a Delaware corporation with headquarters in Santa Ana, California.  Corinthian is the operating company for approximately 100 schools located in 25 United States jurisdictions, and an internet-based operation offering programs similar to those offered at its traditional brick-and-mortar schools.  Corinthian is authorized to do business and is doing business in Utah, within Salt Lake County.  According to Defendant's 10-K, as of March 2010, Defendant had 112,489 customers attending its for-profit colleges in the United States, including persons in the state of Utah.

20.     The true names and capacities (whether individual, corporate, associate or otherwise) of Defendants Does 1 through 20, inclusive, are unknown to Plaintiffs.  Plaintiffs sue these Defendants by fictitious names and will seek leave to amend this Complaint after their identities are learned.  Each fictitious defendant contributed to the acts and practices alleged

8

herein.  Plaintiffs are informed and believe that the fictitiously named defendants proximately caused Plaintiffs' damages.

## FACTUAL ALLEGATIONS

### I.   THE DECEPTIVE AND MISLEADING CONDUCT

21.     Defendant has designed, planned, and implemented a broad and deliberate scheme of misrepresenting and concealing material facts related to the actual cost and value of its educational programs, in a concerted effort to induce student enrollment.  The fraud perpetrated by Defendant begins with its initial web, television, or print advertisement, continues during a telephone or face-to-face meeting with admissions and financial aid representatives, and ends when the student is induced to sign an enrollment agreement and applications for tens-of-thousands of dollars in student loans.

22.     Upon information and belief, the deceptive practices are conceived, authorized, encouraged, and overseen by Defendant's executive management and disseminated to employees in a controlled, scripted, and planned manner.

### A.   Deceptive, Misleading, and Unconscionable Practices Relating to Accreditation and Credit Transferability

23.     Many students who consider enrolling at Everest plan to seek further degrees and training at other post-secondary institutions.  Accordingly, a crucial fact for such students is whether the credits they earn at Everest can be transferred to other schools.

9

24.     Most public or non-profit colleges will only accept credits for transfer if those credits were earned at a school that is "accredited" by what are known as "regional" accrediting entities.

25.     Everest College's Salt Lake City campus is accredited by the Accrediting Council for Independent Colleges and Schools ("ACICS"). ACICS is a specialized accrediting body and part of a group of national institutional accrediting associations that evaluate particular units, schools, or programs within an institution or unique institutions such as trade and technical colleges, "career colleges" or universities, and colleges that seek accreditation for their affiliation with a certain religious body.

26.     On the basis of the ACICS accreditation, Everest claims that it has "national accreditation."

27.     But Everest is unable to or unwilling to seek accreditation by what are known as the "regional" accrediting associations. "Regional" accreditation is the type of accreditation that is required and recognized by most public or non-profit post-secondary institutions across the country.

28.     There are six regional associations that provide institutional accreditation and that are named after the regions in which they operate (Middle States, New England, North Central, Northwest, Southern, and Western). These regional associations cooperate extensively and acknowledge one another's accreditation. The North Central Association that accredits schools within Everest's region establishes close relationships between many other colleges and secondary schools of the region. The Higher Learning Commission is a member of the North

Central Association, and through its membership, is empowered to conduct accrediting activities for educational institutions.

29.    Everest's Arizona campus is one of the few Everest campuses that is accredited by a regional accrediting institution. The large majority of Everest's campuses, including its Salt Lake City campus, are accredited only by one of two national accrediting institutions: (i) the Accrediting Commission of Career Schools and Colleges; or (ii) the ACICS. Additionally, Everest's individual programs, such as its surgical technologist program, may be accredited by other niche-specific national accrediting bodies.

30.    Plaintiffs and members of the class are, and were, unaware of the distinction or the importance of the distinction between regional accreditation and national accreditation, and the ultimate value it confers upon credits, certificates, or degrees earned at educational institutions.

31.    The distinction between regional and national accreditation does, however, have a direct impact on the transferability of credits earned at Everest, and transferability of credits is something that is crucial to prospective students.

32.    Defendant is aware of prospective students' ignorance of or confusion about this important distinction. Defendant also is aware that because Everest is not regionally accredited, credits earned at Everest will not be accepted for transfer in any of the public and private regionally accredited schools in the Salt Lake region, including Salt Lake Community College ("SLCC"), the University of Utah ("UofU"), Weber State University ("WSU"), Utah State University ("USU"), and Brigham Young University ("BYU").

11

33.    However, Defendant undertakes no effort to make prospective students aware of the distinction.  Rather, Defendant devises and instructs admissions representatives to employ calculated and deliberate tactics to prevent the students from obtaining a meaningful understanding of its significance during the advertising, recruiting, and enrollment process, and leads prospective students to believe that credits earned at Everest can be transferred to other post-secondary institutions within Utah.

i.    **The Website**

34.    Everest's website fails to disclose the significance of its accreditation to prospective students, and misleads students into believing that Everest's accreditation is more valuable than it really is.

35.    ACCSC Executive director Michale McComis testified at a Senate hearing that a prospective student would have to "dig" in order to figure out the significance of varying accreditations for a given for-profit college like Everest, because the information is not readily available.[11]  Indeed, on its website, the only time Defendant makes *any* textual distinction between regional and national accreditation is to assure students that Everest gladly "accepts appropriate credits transferred from regionally or nationally accredited institutions."

36.    A prospective student looking for information regarding Everest's accreditation is directed to a multiplicity of deceptive assurances regarding accreditation on Everest's website. Defendant describes Everest's accreditation as an asset that speaks to the high quality of its

---

[11] Statements of Michale McComis, Executive Director of ACCSC at the Second HELP Committee Hearing.

12

educational programs. Underneath a tab entitled "Why Everest?" Defendant invites students to

"learn how our campuses are accredited-and can benefit you." The website states that Everest is

"proud of our accreditation *because it sets us apart*. It's an accreditation that *shows the strength*

*of our academic programs*." (emphasis added). Students must then click on a specific campus

to get access to its individual accreditation information.

37.    On Everest's Salt Lake City campus' accreditation tab, Defendant states:

**WHAT'S ACCREDITATION?**

Accreditation means that Everest has met or surpassed the standards for educational quality. The point is that accreditation:

- Measures and improves educational quality
- Guarantees consistency
- Promotes progress
- Provides accountability

**Why should I care?**

- Is recognized as a qualified institution of higher learning
- Offers instruction that meets or exceeds academic standards
- Employs a professional staff
- Has the proper facilities and equipment
- Is a stable and permanent entity

**Everest trains people for real careers in fields with high rates of employment. And each campus is accredited.**

38.    For further emphasis, Everest tells students that "each Everest school is accredited

by an agency recognized by the U.S. Department of Education and is recognized by the Council

for Higher Education Accreditation."

13

39.     But Everest's website discloses absolutely nothing about the distinctions between the regional, national, and specialized accreditation that directly impact a student's ability to use the credits and degrees obtained at Everest. Everest's website does not disclose that its credits, certifications, and degrees are given no recognition in the regionally accredited institutions within Utah, and thus that credits earned at Everest cannot be transferred to those institutions.

40.     In other words, Everest's carefully worded discussion of its accreditation is limited to the fact that it has received recognition by an accrediting agency. In fact, unbeknownst to prospective students, the type of accreditation Everest has received is far more relevant and material to the actual value of Everest's certificates and degrees. Accreditation type has direct bearing on whether students can transfer the credits earned at Everest to other institutions, in the pursuit other degrees.

41.     Even the descriptions of Everest's programs are deliberately engineered to appeal to persons seeking a prestigious degree in what Everest describes as the "legal," "criminal justice," or "accounting" industries. But the programs are little more than information sessions wherein students learn generic information about the careers they *could* achieve if they received a bachelor's degree, or teaches them broad skills applicable to positions that don't even require any sort of certification or degree. Everest fails to tell students that credits earned in these programs are worthless toward obtaining the degree students need to actually work in the field.

42.     For example, on its website, Everest implies that its "criminal justice" training program is a stepping stone to a variety of careers that require at least a bachelor's degree to achieve. In a video clip on its website, Everest indicates that students enrolled in the program

14

can "go on to become" a social worker.  Everest fails to tell students that a bachelor's degree in social work is required to become a social worker, a program that Everest does not offer. Everest does not tell students the criminal justice credits will be virtually worthless to the student who wishes to transfer to a university and actually pursue a bachelor's or master's degree in social work.

43.     Everest implies that completing its "legal" program is a stepping stone to becoming a practicing lawyer.  In a video clip on its website, a teacher in the "legal" program discloses that some of his "proudest moments occur" when he sees students go on to "become lawyers."  Everest fails to tell prospective students that the credits earned in its "legal" program are worthless toward obtaining the bachelor's degree and, more importantly, the law degree that is required to practice law in the United States.

44.     Everest uses similar tactics to entice students into enrolling in its "business" program.  In another video clip, students learn "about accounting," and the different "opportunities they have as a Certified Public Accountant" ("CPA").  By way of example, the teacher points to his whiteboard where he's written down the options a CPA might have such as "owning their own business" or "work[ing] for a company and learning it inside and out." Everest fails to inform students that they would be required to complete a battery of accounting courses and receive a bachelor's degree should they actually want to become a CPA.  Moreover, like its criminal justice and legal programs, Everest fails to tell students that the credits earned in completing the "business" program may not be utilized toward the pursuit of an actual accounting or other business degree.

### ii.    The In-Person Meeting

45.    When a prospective student contacts Everest, the student is restricted to speaking only with an admissions representative until the student's enrollment has been secured. Admission representatives are put through a comprehensive training program that teaches them how to make uniform representations to potential students to convince them to enroll at Everest and overcome possible objections that may arise during a "sale." Everest representatives are required to meet a minimum enrollment quota to maintain employment and receive promotions. They also receive incentives to sign up as many students as possible and are encouraged to engage in competitions to see how many students they can enroll. Admissions representatives are aware that they will be terminated if they do not meet the minimum quota for enrollments.

46.    David Hawkins, Director of Public Policy and Research at the National Association for College Admission Counseling, testified that "[r]ewarding top recruiters with money and perks is an invitation to mislead applicants" and that the "boiler-room style of recruitment has had real harmful consequences for students and taxpayers."[12]

47.    Everest continues its policy of deception during meetings with its admissions representatives. Through scripted sales pitches, the representatives consistently and systematically use buzz words like "we're fully accredited" to mislead the students regarding the value of the school's programs.

---

[12] Statement of David Hawkins at Second HELP Committee Hearing.

48.    Even when the students ask questions relating to the transferability of credits to specific regional universities and community colleges or indicate that they wish to continue their education elsewhere, Everest representatives do not disclose the truth.  Rather, through scripted responses, Everest representatives make false statements that students should have "no problems" transferring the credits, or that the transferability of credits are limited only by whether the school offers and recognizes the subject matter of a given course.  Some Everest representatives go so far as telling students outright that credits are transferable to a specific local community college or university, even if that is false.

49.    Representatives from SLCC and the University of Utah have confirmed in telephone recordings that they are quite frequently burdened with the task of correcting misinformed Everest students that Everest credits are not recognized.

**B.      Deceptive, Misleading, and Unconscionable Practices Relating to Costs and Fees**

50.    Defendant engaged in deceptive and misleading practices by uniformly and knowingly failing to disclose the complete cost of Everest College's education programs.  These uniform misrepresentations mislead or deceive potential students as to the costs and fees related to enrollment at Everest.  Defendant makes these representations with the intent of inducing students to enroll and to maximize the money Defendant collects from federal and private lenders.  Defendant devises, implements, authorizes, or sanctions the policies or training programs that cause the admissions representatives to engage in this deceptive practice.

17

51.     At the second HELP committee hearing, Senator Harkin asked, "What is the likelihood that a typical student considering a for-profit school could actually get an accurate understanding of the cost of the program?" Kutz answered, "It's highly unlikely." This is certainly the case at Everest.

52.     Due to the utter lack of information regarding the actual cost of Everest's programs, Plaintiffs are unable to even allege how such costs are actually determined, or the total cost of a given program at Everest's Salt Lake City campus. Everest's website contains an impressive amount of information, but even the smallest details regarding tuition, costs, financial aid, and scholarships are conspicuously absent. Not one scintilla of information regarding the costs of its program is on Everest's website. Discussions of such matters are limited to a handful of buried representations that financial aid is available to those who "qualify" and that Everest will "help you find an option you can afford."

53.     Students wishing to download brochures or otherwise obtain more information cannot, but must fill out a contact form and submit it to the school to be contacted by the admissions representative. Students who call Everest are likewise directed to meet with an admissions representative.

54.     Everest admission representatives knowingly misrepresent the total costs of education. During the admissions process, if a prospective student pushes the admission representative to reveal a total cost or cost per credit, the admissions representatives uniformly tell students that the financial aid department will assist the students with affording the program through loans, grants, or scholarships, or, when pressed, give unsubstantiated estimates of total

18

cost. In fact, the only verbal or written information a student is given during this process

regarding the cost of the program is the consistently inaccurate "estimated cost" per academic

year.

55.    When meeting with the financial aid department, students then are given a sheet

containing the number of credits the student needs to complete his or her program, and the

amount that each credit hour will cost. But the total cost is not displayed or otherwise directly

conveyed to the students. This is because the actual cost per unit is more than <u>double</u> the amount

of the estimated cost per year—the same estimated cost that the students reviewed only moments

ago in the admissions department.

56.    To prevent the students from noticing the discrepancy between the estimated and

actual unit costs, the financial aid department uniformly encourages students to take out as much

money as the government will authorize. Thereafter, students are never provided with a

statement of account, bill, or other record of the amount of money the student has paid toward

the total tuition cost. Rather, if students have questions about the cost, students are directed to

keep track of the amount they pay for tuition through federal loan disbursements.

57.    After students matriculate, Everest financial aid representatives continue to prey

upon them and make false and misleading statements that encourage students to seek additional

student loans. Everest financial aid representatives regularly and routinely pull students out of

class to tell them that the amount dispersed for a given term is insufficient to cover the cost of

tuition, and that the students must take out additional loans.

58.     As a result, Plaintiffs and members of the class who have graduated from Everest have incurred debt that amounts to as much as twice the amount of the estimated cost of the program they were originally provided.

**C.      Allegations Specific to Plaintiff Chelsi Miller**

59.     Chelsi Miller first contacted Everest by phone in August 2006 after seeing print advertisements for its surgical technology program.  At the time, Miller was an aspiring pre-med student who worked two jobs, as a waitress and as a Certified Nursing Assistant.  She was intrigued by the ad, and thought it would be a great way to gain practical operating room experience and earn credits and an associate's degree towards her pre-medical curriculum.  As a single mother, Miller could not afford to attend her top-choice school, the University of Utah.  Up until the moment she saw the Everest ad, she was planning to complete her core classes at SLCC, and later transfer to the University of Utah.

60.     Miller first spoke with Everest admissions representative Joe Griffin by telephone.  She told Griffin her plans and that she wanted to ensure her credits and associates degree would be transferable to SLCC or the University of Utah.  Griffin responded by telling Ms. Miller that transferring would be "no problem" because the school was "fully accredited." Griffin asked Miller to come in and meet with him the next day, telling her that she could sign up immediately.

61.     At the close of their face-to-face meeting, Griffin asked Miller to sign an enrollment agreement which he described as "legal mumbo jumbo" that everyone signs before they enroll.  Miller saw confusing and ambiguous language regarding the "probability" of her

credits transferring on the enrollment agreement, so Miller asked Griffin to explain the language

and confirm that the credits were transferable. Griffin urged Miller to disregard the language,

again emphasized that the school was "fully accredited," and made express assurances that both

her degree and credits would be transferable to SLCC and the University of Utah.

62.     After Miller signed the enrollment agreement, Griffin gave Miller a "Student

Financial Planning Sheet" that indicated the estimated cost of the total program. When Miller

asked Griffin to explain the costs, she was immediately shuttled to Everest's financial aid

department. There, financial aid representatives presented Miller with the cost-per-credit sheet,

but pressured Miller to just initiate a request for as much money as she could get to cover her

tuition and fees. Other than the planning sheet and disproportionate cost-per credit quote that she

later more than exceeded in debt, Miller was never provided with specific or accurate

information regarding the cost of the program.

63.     Approximately every three months, Miller was called to the financial aid office

and informed that her federal disbursements did not match the cost of her course load. With no

other explanation (and no documentation), financial aid representatives told Miller that she

would have to incur additional loans to continue classes. Miller was confused because her first

disbursement covered far more than the $12,280.00 estimated cost per program. But because

multiple other students were being asked to do the same thing, and because she believed that she

could not complete her classes at Everest without doing so, Miller acquiesced.

64.     Miller graduated from the program in June 2008. In June 2009, Miller applied to

the University of Utah pre-medical program. She was accepted, but the school informed her that

it did not accept credits from Everest because Everest was not regionally accredited. She would have to pay for and take the courses all over again from the University of Utah.

65.     In August 2009, Miller applied to SLCC, hoping to at least gain recognition of her credits at the less-expensive community college (which, as discussed above, was her original plan), obtain another associates degree there, and use it to transfer to the University of Utah. But SLCC informed Ms. Miller that it also did not recognize credits from Everest because Everest was not regionally accredited, and that she would have to take the courses all over again.

66.     In October 2009, Miller called Everest to confront it about its misrepresentations regarding the transferability of its credits. Once representatives became aware that Miller was privy to their fraudulent practices, they repeatedly directed Miller to unanswered extensions and voicemail boxes. Miller's phone calls and voicemails went unreturned.

67.     In one last attempt to make use of her Everest credits, in March 2010, Miller contacted multiple regionally accredited post-secondary institutions in the Salt Lake region to ask whether they accepted credits from Everest. Every local school Miller contacted confirmed that they did not accept credits earned at Everest and that any such representation by Everest was false because regionally accredited schools did not recognize credits earned at for-profit schools like Everest.

68.     Miller then placed telephone calls to Everest admissions representatives to clarify whether the credits were transferable. This time, suspecting the worst, Miller did not tell the representative that she had already graduated from Everest and had already tried to transfer her credits. Consistent with the company's policy of deceiving and misleading students, Everest

22

representatives still assured Miller that credits and degrees earned at Everest are likely transferable to other institutions like SLCC and the University of Utah.

69.     To be sure, Miller called Everest again and spoke with a third representative. Again, Miller did not tell the representative she had already graduated from Everest and that she could not transfer her credits. And consistent with the company's policy of deceiving and misleading students, the representative assured Miller, for a third time, that credits and degrees earned at Everest are likely transferable to other institutions like SLCC and the University of Utah.

70.     In July 2010, Miller contacted Jack Mossimino, an Everest alumnus and Corinthian College's Executive Chairman of the Board. She told him that she had telephone recordings of Everest's admissions representatives committing fraud, and threatened to publicize the issue if she did not receive a refund for the misrepresentation. She received a response from Corinthian's General Counsel, Stan Morton, who immediately told Miller that she could not record their conversation. He refused to refund Miller's money, but offered to prepare a consolation "transfer portfolio." The portfolio sounded impressive to Miller, and Morton indicated that Everest prepared it all the time for students who complained that they were misled and thought their credits would not transfer. He told her that she could submit the portfolio to schools and that it would persuade them to consider her credits even though Everest was not regionally accredited. Miller agreed to the portfolio. But what she received was a cruel joke: it contained only website print-outs of the schools' surgical technology course offerings.

71.     SLCC and the University of Utah both immediately declined to review the transfer portfolio, and advised Miller that she would just have to enroll, pay for, and take the classes all over again. Accordingly, in the Spring of 2011, Miller will enroll at Salt Lake Community College, where she will be paying, a second time, for courses she purchased and passed at Everest.

72.     If Miller had known the true costs and fees associated with the program and the true value of a nationally accredited degree from Everest, she would not have enrolled at Everest.

73.     Miller has suffered severe financial injury as a direct result of Everest's common course of conduct. Miller graduated from Everest with over $30,000 in loans disbursed on her behalf to Everest.

**D.      Allegations Specific to Plaintiff Daniel Marty**

74.     Plaintiff Marty first contacted Everest in 2008 when he was looking for a college that would allow him to receive an associate's degree and that would be compatible with his evening schedule. Because he was working in the IT field at the time, Plaintiff Marty wanted to obtain a bachelor's or master's degree in computer technology.

75.     Plaintiff Marty was also very interested in the medical field. In 2004, he had attempted to get into the SLCC nursing program, and was put on a four-year waiting list in order to do so. SLCC immediately gave Marty paperwork to determine whether credits he had earned several years ago at the University of Puerto Rico would transfer. SLCC informed Marty that the courses were not transferable because they were old, and that he would have to take the courses over again at SLCC, once he enrolled.

24

76.     During his stay on the four-year waiting list, Plaintiff Marty saw television advertisements for courses at Everest College and decided to visit the school and get more information about its courses related to computer and information technology. Marty walked into the facility and made an inquiry at the front desk.

77.     Admissions representative Lisa Sulfas invited Marty to meet with her and discuss Marty's options for enrolling at Everest. Marty immediately told Sulfas that he was interested in achieving an associate's degree at Everest, but that he ultimately wanted to go for his master's degree in computer technology from a university such as the University of Utah. Because of his previous issues with transferring credits from the University of Puerto Rico, Marty asked Sulfas whether credits earned at Everest would be transferrable. Marty also asked Sulfas whether the program was affordable.

78.     Sulfas assured Marty that credits earned at Everest would easily transfer to the University of Utah and SLCC. But in response to his question regarding affordability, Sulfas told Marty that he would have to sign "paperwork" and then visit financial aid to "see what he could afford." When pressed, Sulfas told Marty that the cost of the computer technology associates program was approximately $32,000.00.

79.     Although Sulfas pressured Marty to enroll that day, Marty wanted to be sure that Everest would be a good financial choice. Marty returned the next day and went directly to financial aid to determine the real cost of the program and the amount of aid he would likely qualify for at the school. Upon inquiring about the program's cost, a financial aid representative told him to just apply for loans and "see how much you can get."

25

80.     Marty became discouraged and concerned that the program was not financially sound and that he could not actually afford Everest.   Marty told financial aid representatives that he would need another day to think about it.  However, Sulfas was waiting for Marty as he attempted to exit the building.  She insisted on giving Marty a tour of the facility that instant. Marty acquiesced.

81.     As he passed the surgical technology classroom, Marty became intrigued.  He told Sulfas about his past attempt to get into the nursing program at SLCC and thought that the surgical technology program might provide a good vehicle for him to do so.  But Marty still wanted to go home and think about it before enrolling.  Sulfas urged Marty to enroll now because classes were starting soon.

82.     After further prompting from Sulfas, Marty agreed to enroll.  Sulfas gave Marty a bunch of paperwork to fill out, explaining that it contained a disclosure that Everest could not guarantee the amount of money that Marty would make, what would happened if he violated school policies, and the terms of using its laboratory and computer equipment.  Sulfas did not tell Marty that he should take the time to read the entire agreement or that it contained important provisions regarding the transferability of credits.  Rather, Sulfas urged Marty to rapidly "fill out the forms" so that he could get to financial aid and "see if [he] qualified."

83.     Throughout his matriculation at Everest, Marty was frequently interrupted during class and sent to the financial aid office.  It was a routine occurrence at the school for many students.  Upon arriving at the financial aid office, representatives told Marty that his tuition balance was more than was originally calculated, and that his existing loans were insufficient to

26

keep him enrolled for the remainder of the term.  When Marty would ask for a statement or other written indication regarding the program's actual cost, he was directed to the federal government's website to look at the amount that had been dispersed on his behalf.

84.     More than once, Marty took out several loans pursuant to the financial aid office's last-minute requests. But he finally refused to take on any more debt to cover his unaccounted for tuition and fees.  As a result, financial aid informed Marty that he would have to drop half of his classes.

85.     Marty decided that he could still achieve his objectives by transferring to the nursing program at SLCC as he had intended to before enrolling at Everest, and ultimately work towards achieving a higher medical degree.  In or around December 2009, Marty contacted SLCC to facilitate the enrollment process, but was immediately informed that SLCC takes credits from "regionally accredited sources only."

86.     Relying on Sulfas' assurances and thinking that SLCC was an exception, Marty contacted the University of Utah a few months later and inquired about enrolling in its Physician Assistant's master's degree program.  The University of Utah immediately informed Marty that credits from "for-profit schools" were not transferable.

87.     Discouraged but optimistic that the credits might be accepted outside of Utah, Marty then contacted a regionally accredited school in Anaheim, California, and told them of his interests and intentions.  The school immediately informed him that they did not recognize credit earned at "those kinds of schools."

88.     Marty finished Everest's program in August 2010, realizing that in order to achieve his ultimate goal of obtaining a Physician's Assistant master's degree, he will be forced to pay for and attend duplicative classes at a regionally accredited institution.

89.     If Marty had known the true costs and fees associated with the program and the true value of a nationally accredited degree from Everest, Marty would not have enrolled at Everest.

90.     Marty has suffered severe financial injury as a direct result of Everest's common course of conduct.  Marty graduated from Everest with over $40,000 in loans disbursed on his behalf to Everest.

**E.      Allegations Specific to Plaintiff Christie Cotton**

91.     In 2004, Plaintiff Cotton decided she wanted to work in the medical field and aspired to get a bachelor's degree in nursing.  Obtaining an associate's degree first from a reputable school was important to Cotton, because she had not earned her high school diploma and had opted to take the General Educational Development ("GED") test instead.

92.     She had heard that SLCC's surgical technology program was an excellent way to gain experience in the medical field while earning credits toward a nursing degree or other bachelor's degree.  She decided to apply to SLCC's surgical technology program, but learned there was a two-year waiting list to get into the program.

93.     In 2005, Cotton started seeing several print and television advertisements for Everest's surgical technology program.  She wanted to get more information about the program so she visited the school and met with an admissions representative named Pam.

94.     During the meeting, Pam told Cotton that because she was a single, pregnant mother with two children, she would qualify for grants and scholarships that would make the program extremely affordable.  When Cotton asked her how much it cost, Pam told her that after she enrolled that day financial aid would assist her with applying for loans, grants, and scholarships and coming up with a financial plan.

95.     Cotton had seen a sign posted in Everest's lobby indicating that Everest was accredited.  Cotton did not know anything about accreditation so she asked Pam what it meant. She emphasized her concern about her GED and told Pam she wanted to ensure she had the option of transferring to either SLCC or another four-year university in close proximity to Cotton's Salt Lake home upon completion of the program.  Pam specifically told Christie the credits would transfer to SLCC, Weber State University, and the University of Utah.

96.     Cotton had not intended to sign up that day, but she was so impressed with the opportunity that she agreed to enroll. Pam produced the Enrollment Agreement and indicated the lines and paragraphs that Cotton needed to sign.  The Enrollment Agreement seemed complicated to Cotton and she did not fully understand it.  Since she thought Pam had given her all of the information she needed to make a decision that day, she went ahead and signed the forms.

97.     At the financial aid department, Cotton filled out applications for loans, grants and scholarships.  She became confused about the cost of the program and what she would have to pay.  When she asked for clarification and specific information, the representatives told her "not to worry about it" because her unique combination of grants and scholarships would require

29

her to pay back only $50.00 a month after graduation.  After enrolling, Christie waited to receive evidence that a grant or scholarship had been applied to her tuition balance, and other paperwork setting forth the terms of her tuition, payments, and fees, and received nothing.  She later received a bill from Sallie Mae indicating that it had dispersed over $30,000 in student loans to Everest on her behalf.  After graduation, she learned she would be paying Sallie Mae approximately $250.00 per month.

98.     In February 2010, Cotton decided to contact the University of Utah to start the process of enrollment.  The school informed her that it would not accept associate's degrees earned at Everest to fulfill any of its requirements or otherwise give credit for classes taken at Everest.  Cotton later found out that the same was true for Weber State University and all other regionally accredited universities in the region.

99.     If Cotton had known the true costs and fees associated with the program and the true value of a nationally accredited degree from Everest, Marty would not have enrolled at Everest.

100.     Cotton has suffered severe financial injury as a direct result of Everest's common course of conduct.  Cotton graduated from Everest with over $30,000 in loans disbursed on his behalf to Everest.

## CLASS ALLEGATIONS

101.     Plaintiffs seek to represent two classes of consumers with respect to common law class claims governed by Utah Rules of Civil Procedure 23(a) and (b), and for UCPSA class

claims governed by Utah Code Ann. § 13-11-20 (1) and (2). First, with respect to the claims arising out of Defendant's misrepresentation and omissions concerning transferability of credits and accreditation, Plaintiffs seek to represent a class defined as follows:

> All persons who completed courses and/or received credits from Everest during the period commencing four years prior to the date of the filing of this action.

102. Second, with respect to the claims arising out of Defendant's misrepresentations and omissions concerning Everest's tuition and fees, Plaintiffs seek to represent a class defined as follows:

> All persons who completed courses and/or received credits from Everest during the period commencing four years prior to the date of the filing of this action.

103. Both proposed classes are composed of at least hundreds of persons, and possibly exceed one thousand persons. Joinder of each of these persons would be impracticable. The disposition of their claims through this class action will benefit both the parties and the Court.

104. This case presents questions of law and fact common to the classes, including, but not limited to, the following:

a. Whether Defendant engaged in deceptive, misleading, and unconscionable practices through devising, implementing, authorizing or sanctioning the internal policies or training programs described herein in violation of the Utah Consumer Protection Act;

31

b.      Whether Defendant engaged in deceptive, misleading, and unconscionable practices through the knowing misrepresentations and omissions regarding the transferability of credits in violation of Utah Consumer Protection Act;

c.      Whether Defendant engaged in deceptive, misleading, and unconscionable practices through the knowing misrepresentations and omissions regarding the costs and fees associated with enrollment in violation of Utah Consumer Protection Act;

d.      Whether Defendant's conduct constituted fraudulent or negligent misrepresentation, as alleged herein;

e.      Whether Plaintiffs and members of the class are entitled to recover compensatory damages, as a result of Defendant's unlawful practices;

f.      Whether Plaintiffs and members of the class are entitled to recover punitive damages, as a result of Defendant's unlawful practices;

g.      Whether Plaintiff and members of the class are entitled to an award of reasonable attorneys' fees, pre-judgment interest and costs of this suit; and

h.      Whether Defendant should be enjoined from making false and misleading representations to students prior to enrollment.

105.   Plaintiffs' claims are typical of the claims of the members of the classes because they have all been damaged in the same way as a result of Defendant's uniform misrepresentations and omissions.  As a result of such omissions and misrepresentations, Plaintiffs and members of the classes enrolled at Everest.  Accordingly, the interests of the

representative Plaintiffs are co-extensive with the interest of each class member and all have a common right of recovery based upon the same facts.

106.   Plaintiffs are adequate representatives of the classes because Plaintiffs' interests do not conflict with the interests of the class members Plaintiffs seek to represent.  Plaintiffs will fairly and adequately represent and protect the interests of the classes because Plaintiffs are not antagonistic to the classes.  Plaintiffs have retained counsel that is competent and experienced in the prosecution of class action litigation.

107.   The questions of law or fact common to the claims of Plaintiffs and the claims of each class member predominate over any question of law or fact affecting only individual class members.  Given the number of class members, the common financial distress to each class member, the typicality of Plaintiffs' claims to those of the class members, the adequate representation of the class members by the Plaintiffs' and the interests of judicial economy, the class action device is superior to other methods for the fair and efficient resolution of this controversy.  Few class members can afford to seek legal redress for the wrongs complained of herein.  Absent this action, class members will continue to be deceived and misled and suffer loss without remedy, and Defendant will continue to profit on the backs of misled and deceived students.

## VIOLATIONS OF THE UTAH SALES AND CONSUMER PRACTICES ACT

### COUNT I
**(Deceptive, Misleading, and Unconscionable Acts and Practices Related to the Transferability of Credits)**

108.     Plaintiffs incorporate by reference each and every allegation set forth in paragraphs 1 through 107 as if fully stated herein.

109.     Sections 13-11-3 and 13-11-5 of the UCSPA prohibit sellers from knowingly and intentionally engaging in deceptive and unconscionable acts in connection with a consumer transaction.

110.     Defendant is a "supplier" under § 13-11-1 *et seq.* of the UCSPA because it sells and regularly solicits, engages, and enforces consumer transactions.

111.     The conduct complained of herein involves a consumer transaction within the meaning of the UCSPA because it involves the sale of goods and/or services to consumers and requires an expenditure of money.

112.     Section 13-11-4(2)(a) provides that it is a deceptive trade practice to indicate that the subject of a consumer transaction has "sponsorship, approval, performance, characteristics, accessories, uses, or benefits, if it has not." Defendant violated Section 13-11-4(2)(a) of the UCSPA when it knowingly and intentionally misrepresented and omitted material facts regarding the transferability of its credits while recruiting prospective students.

113.     Defendant engaged in unconscionable acts and practices under section 13-11-5(2) by:

34

a. Uniformly engaging in high-pressure sales tactics intended to prevent students from discovering material information regarding Everest's tuition and the transferability of credits;

b. Uniformly making false, misleading, and deceptive statements and omissions regarding the value of a degree earned at Everest College during the recruiting process to induce students to enroll at Everest College;

c. Uniformly making false, misleading, and deceptive statements and omissions regarding the transferability of its credit during the recruiting process to induce students to enroll at Everest College; and

d. Uniformly making false, misleading, and deceptive statements and omissions regarding its accreditation and the accreditation of other schools to induce students to enroll at Everest College.

e. Uniformly failing to explain the effect of the terms of the Enrollment Agreement specific to the "probability" of the transferability of Everest College credits.

114.    Plaintiffs and members of the class have suffered harm as a proximate result of Defendant's violations of the UCSPA for deceptive, misleading, and unconscionable acts and practices regarding the transferability of its credits.  Pursuant to Utah Code § 13-11-19, consumers are entitled to:

a.    Actual damages;

35

b.      An order enjoining the unlawful practices described herein;

c.      Statutory penalties of $2,000 for each individual violation;

d.      Appropriate ancillary relief including restitution;

e.      Appropriate ancillary relief including disgorgement of profits;

f.      Punitive damages;

g.      Reasonable attorneys' fees and costs; and

h.      Any other relief that the Court deems proper.

WHEREFORE, Plaintiffs on behalf of themselves and on behalf of the members of the class pray for relief as outlined below.

### COUNT II
**(Deceptive, Misleading and Unconscionable Acts and Practices Relating to the Program Costs)**

115.    Plaintiffs incorporate by reference each and every allegation set forth in paragraphs 1 through 114 as if fully stated herein.

116.    Section 13-11-4(2)(r) provides that it is a deceptive trade practice to "charge a consumer for a consumer transaction that has not been previously agreed to by the consumer." Defendant knowingly and intentionally violated Section 13-11-4(2)(r) of the UCSPA by, without limitation, knowingly and intentionally providing misleading and confusing calculations about the costs and fees associated with enrollment; and misrepresenting and omitting the total cost of programs.

117.    Defendant engaged in unconscionable acts and practices under section 13-11-4(2) by uniformly making false, misleading, and deceptive statements and omissions regarding the cost of the program during the recruiting process to induce students to enroll at Everest College.

118.    Plaintiff and members of the class have suffered harm as a proximate result of Defendant's violations of the UCSPA for deceptive, misleading, and unconscionable acts and practices regarding its program costs and are entitled to damages under the USCPA as stated herein.

WHEREFORE, Plaintiffs on behalf of themselves and on behalf of the members of the class pray for relief as outlined below.

## PER SE VIOLATIONS OF THE UTAH SALES AND CONSUMER PRACTICES ACT

## COUNT III
### (Bait Advertising Relating to the Transferability of Credits)

119.    Plaintiffs incorporate by reference each and every allegation set forth in paragraphs 1 through 118 as if fully stated herein.

120.    A class of consumers may also sue for violations of the UCSPA when authority has declared a given practice to be a substantive violation of § 13-11-4 or 13-11-5 of the USCPA. Section R152-11 of the Utah Administrative Code delineates several acts which, per se, constitute a violation of section 4 of the UCSPA.

37

121.     The sale of education services is a "consumer commodity" and "product" under the Utah Administrative Code § 152-11-1 *et. seq.* because it is the subject or object of a "consumer transaction."

122.     Utah Admin. Code § R152-11-3 (1) provides that it is a deceptive act or practice when a seller engages in bait advertising by "us[ing] a statement or illustration in any advertisement that would create in the mind of a reasonable consumer the false impression of the grade, quality...or usability" of a consumer commodity if the consumer would be diverted upon "disclosure or discovery of the true facts."

123.     Defendant engaged in bait advertising when it knowingly and intentionally misrepresented and omitted material facts regarding the transferability of its credits while selling education packages to Plaintiffs and members of the class.  Defendants "baited" consumers by giving them the false impression that the credits were valuable and could be used at regionally accredited institutions.  If Plaintiffs and the class members had discovered the true facts about Everest's accreditation and credits, Plaintiffs and the class members would have sought enrollment at other institutions and would not have sought enrollment at Everest.

124.     Utah Admin. Code § R152-11-3 (3) provides that it is also a deceptive act or practice when a seller engages in bait advertising by (a) accepting consideration for consumer commodities that are later switched to other commodities; or (b) delivering commodities that are "unusable or impractical for the purposes represented or materially different from the offered consumer commodities."

125.    Defendant further engaged in bait advertising by accepting payment of tuition under the false pretense that the student would earn credits that could be utilized at other universities, but in actuality, delivered credits that were "unusable," "impractical," and "materially different" from what was represented to the at the consummation of the sale.

126.    Bait advertising is a per se deceptive act or practice under Section 13-11-4(2)(a) of the UCSPA.  Plaintiffs and members of the class have suffered harm as a proximate result of Defendant's bait advertising.  Accordingly, Plaintiffs and members of the class are entitled to damages for such violations of the USCPA as stated herein.

WHEREFORE, Plaintiffs on behalf of themselves and on behalf of the members of the class pray for relief as outlined below.

## COUNT IV
### (Failure to Properly Exclude and Limit Cost Advertisements)

127.    Plaintiffs incorporate by reference each and every allegation set forth in paragraphs 1 through 126 as if fully stated herein.

128.    Utah Admin. Code § R152-11-2 (A)(1) provides that it is a deceptive act or practice when a supplier makes an offer in a writing "without stating clearly and conspicuously in close proximity" any conditions or limitations, including "not disclosing the amount of any additional charge."

129.    Defendant offers prospective students cost estimates without disclosing the accurate amount of the charge.  Everest continues to make various offers and receives money for services while suppressing the service's actual price.

39

130.    Everest charges far more than its original and subsequent offers ever disclose.  Everest has failed to properly disclose this information in written communications with students, which is a per se deceptive act or practice under the USPCA.  Plaintiffs and members of the class have suffered harm as a proximate result of Defendant's conduct and are entitled to damages for such violations of the USCPA as stated herein.

WHEREFORE, Plaintiffs on behalf of themselves and on behalf of the members of the class pray for relief as outlined below.

**FRAUDULENT MISREPRESENTATION**

**COUNT V**
**(Fraudulent Misrepresentations Relating to the Transferability of Credits)**

131.    Plaintiffs incorporate by reference each and every allegation set forth in paragraphs 1 through 130 as if fully stated herein.

132.    Defendant knowingly, intentionally, and willfully undertook an effort to deceive and mislead prospective students in enrolling in courses at Everest, when it:

a.  Uniformly, intentionally and knowingly made material misstatements and omitted material facts regarding the transferability of its credits;

b.  Uniformly, intentionally and knowingly made material misstatements and omitted material facts regarding its accreditation status;

    c.  Uniformly, intentionally and knowingly made material misstatements and omissions of fact indicating that national accreditation confers the same benefits upon degrees and credits as regional accreditation; and

    d.  Uniformly, intentionally and knowingly misrepresented and omitted the true value of credits obtained at a nationally accredited institution in the regionally accredited marketplace.

133.    The misrepresentations and omissions were material to Plaintiffs and the class members' decision to attend Everest because students cannot actually use the credits for the intended purpose of obtaining a bachelor's or master's degree at regionally accredited schools after graduation.

134.    Plaintiffs and the class members relied upon the material misrepresentations and omissions when they enrolled at Everest. As a direct and proximate result of Defendant's actions, Plaintiffs have suffered actual damages.

WHEREFORE, Plaintiffs on behalf of themselves and on behalf of the members of the class pray for relief as outlined below.

## COUNT VI
### (Fraudulent Misrepresentations Relating to Program Costs)

135.    Plaintiffs incorporate by reference each and every allegation set forth in paragraphs 1 through 134 as if fully stated herein.

136.    Defendant knowingly, intentionally, and willfully undertook an effort to deceive and mislead prospective students in enrolling in courses at Everest, when it made material misstatements and omitted material facts regarding the actual costs of its programs.

137.    The misrepresentations and omissions were material to Plaintiffs and the class members' decision to attend Everest because students are not aware of the actual costs of the program until after it has been completed and have relied instead upon Defendant's misstated estimate of costs.

138.    Plaintiffs and the class members relied upon the material misrepresentations and omissions when they enrolled at Everest and would not have enrolled at Everest if they knew its actual cost.  As a direct and proximate result of Defendant's actions, Plaintiffs have suffered actual damages.

WHEREFORE, Plaintiffs on behalf of themselves and on behalf of the members of the class pray for relief as outlined below.

## NEGLIGENT MISREPRESENTATION

### COUNT VII
**(Negligent Misrepresentations Concerning to the Transferability of Credits)**

139.    Plaintiffs incorporate by reference each and every allegation set forth in paragraphs 1 through 138 as if fully stated herein.

140.     Defendant knew or should have known that during the high-pressure sales meetings, students seeking to enroll at Everest and transfer credits and degrees earned toward degrees at other universities would rely on false or misleading statements regarding the following:

    a.  Uniformly material misstatements and omitted material facts regarding the transferability of credits;

    b.  Uniformly material misstatements an omitted material facts when it uniformly misrepresented that national accreditation is confers the same benefits upon degrees and credits as regional accreditation;

    c.  Uniformly misrepresented and omitted the true value of credits obtained at a nationally accredited institution in the regionally accredited marketplace.

141.     The misrepresentations and omissions were material to Plaintiffs and the class members' decision to attend Everest because students cannot actually use the credits for the intended purpose of obtaining a bachelor's or master's degree at regionally accredited schools after graduation.

142.     Plaintiffs and the class members relied upon the material misrepresentations and omissions when they enrolled at Everest. As a direct and proximate result of Defendant's actions, Plaintiffs have suffered actual damages.

WHEREFORE, Plaintiffs on behalf of themselves and on behalf of the members of the class pray for relief as outlined below.

## COUNT VIII
### (Negligent Misrepresentations Relating to Program Costs)

143.     Plaintiffs incorporate by reference each and every allegation set forth in paragraphs 1 through 142 as if fully stated herein.

144.     Defendant knew or should have known that students seeking enrollment would rely on its material misstatements and omitted material facts regarding the actual costs of its programs.

145.     The misrepresentations and omissions were material to Plaintiffs and the class members' decision to attend Everest because students are not aware of the actual costs of the program until after it has been completed and have relied instead upon Defendant's misstated estimate of costs.

146.     Plaintiffs and the class members relied upon the material misrepresentations and omissions when they enrolled at Everest.  As a direct and proximate result of Defendant's actions, Plaintiffs have suffered actual damages.

WHEREFORE, Plaintiffs on behalf of themselves and on behalf of the members of the class pray for relief as outlined below.

## DECLARATORY JUDGMENT AS TO ARBITRATION CLAUSE

## COUNT IX
### (Procedurally and Substantively Unconscionable Enrollment Agreement)

147.    Plaintiffs incorporate by reference each and every allegation set forth in paragraphs 1 through 146 as if fully stated herein.

148.    Everest's Enrollment Agreement contains arbitration provisions that submits "any dispute" to Arbitration and prohibits students from consolidating their claims in a class or mass actions against Everest with "other students."

149.    The clause limits Plaintiffs' unwaivable rights to class litigation under the USPCA, and, thus, prevents class members from obtaining the equitable declaratory and injunctive relief afforded for deceptive, unconscionable, and misleading conduct.

150.    The clause wrongfully limits Plaintiffs' right to recover in consolidated litigation against Everest where individual litigation would be impracticable, overly burdensome, and judicially inefficient.  The clause thus has a chilling effect on consumer litigation against Everest that effectively insulates Everest from liability.

151.    The clause is contained in an agreement entered into during high-pressure sales meetings wherein there is highly unequal bargaining power between Everest and the

prospective student.  Students were discouraged from reading the full agreement, and encouraged to sign it quickly, without a full understanding of its terms.

152.    The clause is contained in an agreement that was entered into during a high-pressure sales meeting where multiple fraudulent misrepresentations and omissions occurred and a general lack of mutuality permeated the negotiations.

153.    The multiple substantively unconscionable defects of the clause are alone indicative of an unlawful effort to impose arbitration on students not as an alternative to litigation, but in an inferior forum that works to Everest's advantage.  Moreover, the circumstances under which the clause was presented were egregiously unfair and oppressive, devoid of any actual negotiation, and designed to take advantage of the unequal bargaining power between the student and Everest.  These unconscionable aspects, either combined or alone, render the clause wholly unenforceable.

154.    Plaintiffs and members of the class are entitled to declaratory relief that the multiple substantive and procedural defects of the arbitration clause render it wholly unconscionable and unenforceable.

WHEREFORE, Plaintiffs on behalf of themselves and on behalf of the members of the class pray for relief as outlined below.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs, on behalf of themselves and the class, pray for:

A.     An order certifying the Class and appointing Plaintiffs and their counsel of record to represent the Class;

B.     A declaration that the arbitration clause in Everest's Enrollment Agreements is unconscionable and unenforceable;

C.     An order enjoining Defendant from engaging in the conduct and practices complained of herein;

D.     Restitution, disgorgement, and such other equitable relief this Court deems proper;

E.     Imposition of a constructive trust upon all monies and assets Defendant has acquired as a result of its unfair and unlawful practices;

F.     Actual damages sustained by Plaintiffs and all others similarly situated as a result of Defendant's unlawful conduct and practices complained of herein;

G.     Punitive damages;

H.     Prejudgment and post-judgment interest;

I.     Reasonable attorneys' fees and costs of suit; and

J.     Any and such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

FILLMORE SPENCER LLC


By: _Matthew R Howell_____
Randall K. Spencer
Matthew R. Howell
3301 North University Avenue
Provo, Utah 84604

Jonathan K. Tycko
Melanie Williamson
TYCKO & ZAVAREEI LLP
2000 L Street N.W., Suite 808
Washington, D.C. 20036

*Attorneys for Plaintiffs Chelsi Miller, Daniel Marty, and Christie Cotton*

48

3RD DISTRICT COURT - SALT LAKE
SALT LAKE COUNTY, STATE OF UTAH

CHELSI MILLER vs.   CORINTHIAN COLLEGES INC

CASE NUMBER 100918220 Miscellaneous

CURRENT ASSIGNED JUDGE
        JOSEPH C FRATTO

PARTIES

        Plaintiff - CHELSI MILLER
        Represented by: RANDALL K SPENCER

        Plaintiff - DANIEL MARTY
        Represented by: RANDALL K SPENCER

        Plaintiff - CHRISTIE COTTON

        Defendant -  DOES 1 THRU 20

        Respondent -  CORINTHIAN COLLEGES INC

ACCOUNT SUMMARY

        TOTAL REVENUE  Amount Due:        637.50
                       Amount Paid:        637.50
                             Credit:          0.00
                            Balance:          0.00


        REVENUE DETAIL - TYPE: COMPLAINT - NO AMT S
                       Amount Due:        360.00
                       Amount Paid:        360.00
                       Amount Credit:       0.00
                            Balance:          0.00

        REVENUE DETAIL - TYPE: JURY DEMAND - CIVIL
                       Amount Due:        250.00
                       Amount Paid:        250.00
                       Amount Credit:       0.00
                            Balance:          0.00

        REVENUE DETAIL - TYPE: COPY FEE
                       Amount Due:         12.75
                       Amount Paid:         12.75
                       Amount Credit:        0.00
                            Balance:          0.00

Printed: 10/06/10 16:51:35          Page 1

CASE NUMBER 100918220 Miscellaneous

```
        REVENUE DETAIL - TYPE: COPY FEE
                Amount Due:        14.75
                Amount Paid:       14.75
                Amount Credit:      0.00
                   Balance:         0.00
```

CASE NOTE


PROCEEDINGS

```
09-24-10 Filed: Complaint
09-24-10 Judge JOSEPH C FRATTO assigned.
09-24-10 Filed: Complaint   No Amount
09-24-10 Filed: Demand Civil Jury
09-24-10 Fee Account created    Total Due:      360.00
09-24-10 Fee Account created    Total Due:      250.00
09-24-10 COMPLAINT - NO AMT S    Payment Received:      360.00
         Note: Code Description: COMPLAINT - NO AMT S, JURY DEMAND
         - CIVIL
09-24-10 JURY DEMAND - CIVIL    Payment Received:        250.00
09-27-10 Fee Account created    Total Due:      12.75
09-27-10 COPY FEE               Payment Received:      12.75
         Note: 13.00 cash tendered.        0.25 change given.
09-29-10 Fee Account created    Total Due:      14.75
09-29-10 COPY FEE               Payment Received:      14.75
```